IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

No. 95-60251

JAMES H. CLARK; BARBARA BROWN,

Plaintiffs-Appellants,

versus

CALHOUN COUNTY, MISSISSIPPI;
CALHOUN COUNTY DEMOCRATIC EXECUTIVE COMMITTEE,
By and Through its Chairperson, J. R. Denton;
CALHOUN COUNTY REPUBLICAN EXECUTIVE COMMITTEE,
By and Through its Chairperson, Henry Bailey;
CALHOUN COUNTY ELECTION COMMISSIONS,
By and Through its Chairperson, R.W. Bounds,

Defendants-Appellees.

Appeal from the United States District Court
for the Northern District of Mississippi

July 9, 1996

Before LAY*, HIGGINBOTHAM and STEWART, Circuit Judges.

HIGGINBOTHAM, Circuit Judge:

This case comes before us for the second time, raising the question whether the plaintiffs have proven, under the totality of the circumstances, that Calhoun County, Mississippi's districting plan for county officials violates Section 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973(a). The district court held that the plan did not violate the Act. We disagree. We reverse the

---

*        Circuit Judge of the Eighth Circuit, sitting by designation.

judgment of the district court and render judgment for the plaintiffs.

I.

The basic facts of this case are fully described in our decision rendered the first time this case was before us. See Clark v. Calhoun County, Mississippi, 21 F.3d 92 (5th Cir. 1994). To briefly summarize those facts: The plaintiffs, James Clark and Barbara Brown, are black residents and registered voters in Calhoun County, Mississippi. The county's districting plan divides the county into five districts, each of which elects one county supervisor, one board of education member, and one election commissioner.

Following the release of the 1990 census, the County Board of Supervisors hired Three Rivers Development and Planning District of Pontotoc, Mississippi to develop a redistricting plan for the county. The Board also appointed a biracial committee made up of one black resident and one white resident from each election district to supervise Three Rivers' work. Three Rivers developed two redistricting plans, one of which the Board of Supervisors tentatively adopted. The biracial committee approved the plan, and the Board formally adopted the plan after a public hearing. Pursuant to § 5 of the Voting Rights Act, the Department of Justice subsequently precleared the proposed redistricting plan.

According to the 1990 census, black residents comprise 23% of the county's voting age population and 27% of its population overall. Under the plan adopted by the Board of Supervisors, the

2

black population is divided roughly equally among the five districts, ranging from a low of 19% of the population in District 3 to a high of 42% in District 4.

The plaintiffs sued the County, the Calhoun County Democratic Executive Committee, the Calhoun County Republican Executive Committee, and the Calhoun County Election Commission. The plaintiffs alleged that the County's redistricting plan violated § 2 of the Voting Rights Act, as well as the Fourteenth and Fifteenth Amendments to the U.S. Constitution. The plaintiffs sought damages, declaratory, and injunctive relief, along with attorneys' fees.

After a bench trial, the district court granted judgment to the County, concluding that the plaintiffs had failed to prove that a geographically compact black majority district could be created. In addition, the court concluded that under the totality of circumstances, the plaintiffs had failed to prove a § 2 violation. The district court's written opinion did not address the plaintiff's constitutional claims, but the plaintiffs did not appeal the dismissal of those causes of action. We vacated the district court's judgment and remanded for further proceedings on the plaintiff's statutory claim. See Clark v. Calhoun County, 21 F.3d 92 (5th Cir. 1994).

On remand, the parties submitted additional evidence regarding the feasibility of drawing a geographically compact majority-minority district and the existence of racially-polarized voting in the county. After reviewing the evidence, the district court found

3

that a geographically compact black majority district could be created and that racially polarized voting existed in the county. Noting that the plaintiffs had satisfied the three preconditions from Thornburg v. Gingles, 478 U.S. 30 (1986), the court reconsidered its findings regarding the totality of the circumstances. Without elaboration, the court determined that its earlier findings were not erroneous and concluded that "when all the circumstances are considered, 'plaintiffs have not shown that as a result of the adopted supervisory plan, they do not have equal opportunity to participate in the political process and to elect candidates of their choice.'" The plaintiffs appeal the district court's judgment.

## II.

Section 2 of the 1965 Voting Rights Act prohibits any voting practice or procedure that "results in a denial or abridgment of the right of any citizen of the United States to vote on account of race or color." 42 U.S.C. § 1973(a). Thornburg v. Gingles, 478 U.S. 30, 49-51 (1986), set forth three preconditions to establishing a § 2 violation: The plaintiff must demonstrate that 1) the minority group is sufficiently large and geographically compact to constitute a majority in a single-member district; 2) the minority group is politically cohesive; and 3) the white majority votes sufficiently as a bloc to enable it usually to defeat the minority's preferred candidate. Id. at 50-51; Concerned Citizens for Equality v. McDonald, 63 F.3d 413, 416 (5th Cir. 1995). These preconditions apply to challenges to both single-

4

member and multi-member districting schemes.  Growe v. Emison, 113 S.Ct. 1075, 1084 (1993) (applying Gingles to single-member districts).

The three Gingles preconditions are necessary but not sufficient to prove vote dilution.  Johnson v. DeGrandy, 114 S.Ct. 2647, 2657 (1994).  If those preconditions are established, the plaintiffs must further prove that "under the 'totality of circumstances,' they do not possess the same opportunities to participate in the political process and elect representatives of their choice enjoyed by other voters."  League of United Latin American Citizens v. Clements, 999 F.2d 831, 849 (5th Cir. 1993) (en banc), cert. denied, 114 S.Ct. 878 (1994); see 42 U.S.C. § 1973(b).  Although unlawful vote dilution "may be readily imagined and unsurprising" where the three Gingles preconditions exist, that conclusion "must still be addressed explicitly, and without isolating any other arguably relevant facts from the act of judgment."  Johnson, 114 S.Ct. at 2657.

We have previously explained that "courts are guided in this [totality-of-circumstances] inquiry by the so-called Zimmer factors listed in the Senate Report" accompanying the 1982 Amendments to the Voting Rights Act.  LULAC, 999 F.2d at 849.  Those factors include:

> [T]he history of voting-related discrimination in the State or political subdivision; the extent to which voting in the elections of the States or political subdivision is racially polarized; the extent to which the State or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group, such as unusually large election districts,

5

majority vote requirements, and prohibitions against bullet voting; the exclusion of members of the minority group from candidate slating processes; the extent to which minority group members bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process; the use of overt or subtle racial appeals in political campaigns; and the extent to which members of the minority group have been elected to public office in the jurisdiction.

Gingles, 478 U.S. at 44-45. In addition, "evidence demonstrating that elected officials are unresponsive to the particularized needs of the members of the minority group and that the policy underlying the State's or the political subdivision's use of the contested practice or structure is tenuous may have probative value." Id. at 45.

Noting that the district court found on remand that the three Gingles preconditions were satisfied, the plaintiffs challenge the district court's conclusion that, under the totality of the circumstances, the plaintiffs failed to prove a § 2 violation. The plaintiffs refer to our statement in Clark that "'it will be only the very unusual case in which the plaintiffs can establish the existence of the three Gingles factors but still have failed to establish a violation of § 2 under the totality of circumstances.'" 21 F.3d at 97 (quoting Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ., 4 F.3d 1103, 1135 (3d Cir. 1993)) (emphasis added); see also NAACP v. City of Niagara Falls, New York, 65 F.3d 1002, 1019 n.21 (2d Cir. 1995).

We initially note that our review is hampered by the district court's curt discussion regarding the totality of the circumstances. In our previous opinion, we instructed the district

6

court on remand to "reconsider its findings with respect to the totality of circumstances." 21 F.3d at 97. We further instructed the district court that in cases where the three Gingles preconditions have been established, it "'must explain with particularity why it has concluded, under the particular facts of that case, that an electoral system that routinely results in white voters voting as a bloc to defeat the candidate of choice of a politically cohesive minority group is not violative of § 2 of the Voting Rights Act.'" 21 F.3d at 97 (quoting Jenkins, 4 F.3d at 1135). Despite these instructions, the district court readopted its earlier findings without elaboration and summarily concluded that the existence of racially polarized voting in the county was not sufficient to tip the balance in favor of the plaintiffs. This discussion is far from the particularized explanation that we expected. Normally, we would remand this case for further consideration. However, we need not do so where the record establishes unlawful vote dilution. Harvell v. Blytheville School Dist. #5, 71 F.3d 1382, 1390 (8th Cir. 1995) (en banc), cert. denied, __ S.Ct. __ (1996). We are persuaded that the district court's findings from its first opinion regarding the totality of the circumstances, which the court readopted on remand, support the conclusion that Calhoun County's redistricting scheme violates § 2 of the Voting Rights Act. We do not suggest that the totality of the circumstances is an empty formalism or that clearing the Gingles hurdles preordains liability. To the contrary, this final inquiry can be powerful indeed. At the same time, it is more than

an intuitive call of the trial judge; the trial court must anchor its judgment in evidence.

## A.

In its first opinion, the district court found that racially polarized voting existed in Calhoun County, but the court discounted its importance due to the success of black candidates seeking election to several municipal and county offices. The court noted that black residents had been elected to the board of aldermen in two predominately white municipalities in the county and that one black resident, who ran unopposed, had been elected election commissioner in one of the predominately white districts.

On appeal, we concluded that the black electoral successes cited by the district court had "limited relevance." 21 F.3d at 96. Citing Gingles, we explained that "the election of some black candidates does not negate a § 2 claim and does not establish that polarized voting does not exist," particularly when the election is unopposed. Id. We further explained that exogenous elections--those not involving the particular office at issue--are less probative than elections involving the specific office that is the subject of the litigation. Id. at 97. We instructed the district court on remand to "accord greater weight to the virtual absence of black electoral success in county-wide elections as opposed to their limited electoral success in municipal elections." Id.

On remand, the district court reaffirmed its finding of racially polarized voting but construed our instruction as an "invitation to find a section 2 violation simply because plaintiffs

8

have prevailed on the Gingles factors." Correctly noting that the Supreme Court in Johnson had expressly rejected that reading of § 2, the district court declined our "invitation."

As we made clear prior to Johnson, the existence of the three Gingles preconditions is necessary but not sufficient to prove a § 2 violation. See LULAC, 999 F.2d at 849. However, the existence of racially polarized voting and the extent to which minorities are elected to public office remain the two most important factors considered in the totality-of-circumstances inquiry. See Gingles, 478 U.S. at 48 n.15; Westwego Citizens for Better Government v. City of Westwego, 946 F.2d 1109, 1122 (5th Cir. 1991) (Westwego III).

In this case, the district court's finding that racially polarized voting exists is beyond question. In addition to the "uncontradicted" statistical evidence from the original trial, Dr. Richard Engstrom, a Professor of Political Science at the University of New Orleans, analyzed four, multiracial elections in Calhoun County. Using both regression and homogenous precinct analysis, Dr. Engstrom concluded that a "consistent relationship" existed between a voter's race and his voting preference in the four exogenous elections. For example, in the 1991 Democratic primary for Constable, the black candidate received an estimated 71.6% of the black vote but only 7.8% of the white vote. Although statistical evidence is not conclusive, see Clark, 21 F.3d at 96, the record here supports no other conclusion but that racially polarized voting exists in Calhoun County. Indeed, the County

offers no other explanation of the divergent voting patterns.  See Uno v. City of Holyoke, 72 F.3d 973, 983 (1st Cir. 1995).

Moreover, the record demonstrates that black citizen have been unsuccessful in seeking public office.  The County emphasizes that black residents have been elected as aldermen in several municipalities and, in one case, as an election commissioner.  We previously addressed the probative value of these electoral successes and noted their "limited relevance."  21 F.3d at 96. Even so, "the election of a few minority candidates does not necessarily foreclose the possibility of dilution of the black vote."  S. Rep. No. 417, 97th Cong., 2d Sess. 29 n.115 (1982) (internal quotation omitted), reprinted in 1982 U.S.C.C.A.N. 177, 207 n.115; see also Gingles, 478 U.S. at 76; City of Niagara Falls, 65 F.3d at 1009; Harvell, 71 F.3d at 1390.  Indeed, these isolated victories, one of which occurred in a race with no opponent, do not mitigate the force of the district court's finding that "[i]n this century, no black candidate has been elected in Calhoun County as supervisor, justice court judge, constable, sheriff, circuit clerk, chancery clerk, tax assessor, superintendent of education, school board member, coroner, county attorney, state senator, or state representative."  Moreover, there is no suggestion that this striking lack of electoral success is due to low voter turnout or black support for non-minority candidates.  Cf. Alonzo v. City of Corpus Christi, 68 F.3d 944, 947 (5th Cir. 1995) (per curiam).

The County responds that few black residents have run for county office.  As an initial matter, we note that the County

10

overstates the political reality. The district court found in its first opinion that "since 1980 blacks have sought the positions of justice court judge, constable, sheriff, and school board member." More importantly, however, this argument begs the ultimate question whether blacks "possess the same opportunities to participate in the political process and elect representatives of their choice enjoyed by other voters." That few or no black citizens have sought public office in the challenged electoral system does not preclude a claim of vote dilution. Westwego Citizens For Better Government v. City of Westwego, 872 F.2d 1201, 1208 n.9 (5th Cir. 1989) (Westwego I). "To hold otherwise would allow voting rights cases to be defeated at the outset by the very barriers to political participation that Congress has sought to remove." Id.

In short, the presence of racially polarized voting and the virtually complete absence of black elected officials in county offices provides striking evidence of vote dilution in Calhoun County.

B.

The Senate Report includes as one factor "the extent to which the State or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group, such as unusually large election districts, majority vote requirements, and prohibitions against bullet voting." In its original opinion, the district court found that Calhoun County did not employ large election districts or an anti-single shot provision. The court found, however, that state

11

law requires that elections be conducted by majority vote.  See Miss. Code Ann. § 23-15-305.  Although the district court noted that abolishing the majority vote requirement might increase the possibility of electoral success for black candidates, it concluded that the majority vote requirement was not "inherently discriminatory."

We agree with the plaintiffs that the district court misjudged the weight to be accorded this finding.  First, even if the majority vote requirement is not "inherently discriminatory," Congress has included it as one factor to consider as part of the totality-of-circumstances inquiry. We are not free to second-guess Congress' judgment regarding its importance.  See Westwego I, 872 F.2d at 1212.

Second, under certain circumstances, the majority vote requirement "can operate to the detriment of minority voters" and negate their political strength.  Westwego III, 946 F.2d at 1113 n.4.  Where more than two candidates run for a particular office, the majority vote requirement ensures that no candidate supported by only a minority, racial or otherwise, of the populace will succeed.  In the presence of racially polarized voting, the majority vote requirement permits a white majority that scattered its votes among several white candidates in a election to consolidate its support behind the remaining white candidate in the run-off election, thereby defeating the minority-supported candidate. See Major v. Treen, 574 F.Supp. 325, 351 n.32 (E.D. La. 1983) (three judge panel); see also Zimmer v. McKeithen, 485 F.2d

12

1297, 1306 (5th Cir. 1973) (en banc) (noting that majority vote requirement tends "to submerge a political or racial minority"), aff'd sub nom. East Carroll Parish Sch. Bd. v. Marshall, 424 U.S. 636 (1976) (per curiam).

This effect is more than a mere theoretical possibility, at least in Calhoun County. The record here discloses that on at least one occasion, the majority vote requirement operated to the detriment of black voters in Calhoun County by preventing the nomination of a black citizen as the Democratic candidate for constable in Calhoun County. In the first primary, the black candidate, Tommy Pittman, finished first among all candidates, the rest of whom were white. Pittman did not receive a majority of the votes cast, however. In the run-off, Pittman lost.

C.

Two factors from the Senate Report focus on the effect of past discrimination on the plaintiffs' ability to participate in the political process: 1) the history of voting-related discrimination in the State or political subdivision, and 2) the extent to which minority group members bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process. Gingles, 478 U.S. at 44-45. In its pre-remand opinion, the district court found that "in the past blacks were prevented from exercising their right to vote by intentionally discriminatory mechanisms." Nevertheless, the court found this factor to be of "limited importance" because "past history cannot be forever

13

faulted for failures at the election box."  The district court explained that at some point past discrimination must take on "diminished importance."  In addition, the district court found that "the socio-economic status of blacks is significantly lower than whites in Calhoun County" but questioned without elaboration the weight to be assigned to this finding.

The long and unhappy history of discrimination in Mississippi requires no protracted discussion.  Calhoun County itself did not desegregate its schools until 1969.  Nor need we tarry long in recounting the socioeconomic disparity that continues to exist in Calhoun County.  The plaintiffs produced 1990 census data disclosing, among other facts, that the per capita income of black residents in Calhoun County is less than half that of white residents.

The County concedes, as it must, that Calhoun County has a history of racial discrimination and that socioeconomic differences between white and blacks continue to exist in the County. Nevertheless, the County argues that the plaintiffs have not established a causal nexus between such past discrimination or socioeconomic disparities, on the one hand, and any decreased level of black political participation, on the other.

In LULAC, we explained that while Congress has not insisted upon proof of a causal nexus between socioeconomic status and depressed political participation, Congress "did not dispense with proof that participation in the political process is in fact depressed among minority citizens."  999 F.2d at 867; see S. Rep.

14

417 at 29 n.114, reprinted in 1982 U.S.C.C.A.N. at 207 n.114. Indeed, in that case, we held that proof of socioeconomic disparities and a history of discrimination "without more" did not suffice to establish the two Senate Report factors. 999 F.2d at 867.

The district court did not make any finding that black political participation was depressed in Calhoun County. Nor do the plaintiffs on appeal point to any evidence in the record showing that black political participation compares unfavorably to that of white residents in the county. The plaintiffs' expert witness, Cheri McKinless, did testify at the first trial that individuals of lower socioeconomic status were not as likely to vote as individuals of higher socioeconomic status. However, she based her conclusion on political science literature, not "an 'intensely local appraisal' of the social and political climate" of Calhoun County. Id. Indeed, in LULAC, we rejected similar "armchair speculation" as insufficient to establish that "minority voters in this case failed to participate equally in the political processes." Id.

In short, we are not persuaded that the district court erred in disregarding the history of past discrimination and socioeconomic disparity in Calhoun County.

D.

In its pre-remand opinion, the district court found that Calhoun County officials were responsive to concerns of its black residents. The court explained:

15

First, it is unrefuted that the County has recently paved and/or repaved roads in predominately black neighborhoods. . . . Second, it has been stipulated that blacks hold appointive positions on approximately one-third of the County Boards and Commissions. This represents, in this court's mind, a concern that blacks be afforded a voice in matters affecting the citizenry. Finally, the County, in appointing the biracial committee and holding public hearings on the proposed redistricting plan, made a concerted effort to comply with the mandates of the Voting Rights Act. From the beginning, Calhoun County recognized the need for redistricting and attempted to procure Section 2 compliance via an open, public forum. The black members appointed to the biracial committee were, according to the testimony, well respected and influential citizens in the black community; some, like Ms. Rose, were college educated. These are not the actions of a county which is oblivious to the needs and concerns of the black community or disrespectful of the mandates of the Voting Rights Act.

With one caveat, we find no merit to the suggestion that the district court's finding of responsiveness is clearly erroneous. Other governmental entities have done more than Calhoun County to demonstrate their responsiveness to minority concerns. See, e.g., City of Niagara Falls, 65 F.3d at 1023 (noting that the city, inter alia, established an affirmative action task force, adopted a fair housing law, and established a minority business loan fund). Nevertheless, the County's road-paving and its use of a biracial commission to approve the current redistricting plan support the finding that the County is responsive to the needs of the black community. The formation of the biracial commission in particular demonstrates the County's sensitivity to the concerns of its black citizens. Although the record discloses that Three Rivers did not inform the commission that it was possible to create a majority-minority district, that fact alone does not undermine the district court's finding. Indeed, there is no suggestion that the anyone

16

deliberately misled that commission or that the commission served only to rubberstamp redistricting plans already approved by the board of supervisors.

We part company with the district court, however, regarding its reliance on black membership on county commissions. The number of minority members on county commissions is a poor barometer of the county's responsiveness to the needs of its black citizenry. Judging responsiveness by counting members of county commissions is akin to judging the emptiness of a glass of water half full: whether it is half full or half empty depends on who you ask. Even so, we agree with the plaintiffs that the district court erred in this case by focusing on how many minority board members there were, instead of how few. That four of the fourteen county boards or commissions have black members overlooks that ten do not. Moreover, the record discloses that of the four boards that do have minority representation, three have only one black member and the other has only two black members. Of the 72 appointed officials, only five are black, less than 7% of the total membership. Similarly, the district court found that only 6 of the county's 75 employees were black.

Although the district court's finding of responsiveness was not clearly erroneous, we are persuaded that the district court attached too much weight to its finding. First, the finding of responsiveness has "limited relevance." Westwego III, 946 F.2d at 1122. The Senate Report explained:

> Unresponsiveness is not an essential part of plaintiff's case. Therefore, defendants' proof of some

17

responsiveness would not negate plaintiff's showing by other, more objective factors enumerated here that minority voters nevertheless were shut out of equal access to the political process.

S. Rep. 417 at 29 n.116, reprinted in 1982 U.S.C.C.A.N. at 207 n.116; see also Westwego I, 872 F.2d at 1213 n.15. Indeed, in Westwego III, we rendered judgment for the plaintiffs, even though we agreed with the district court that the plaintiffs had failed to prove a lack of responsiveness by city officials. 946 F.2d at 1123; see also Harvell, 71 F.3d at 1391 (noting that "[e]ven accepting the finding of responsiveness as not clearly erroneous, however, it is similarly insufficient to counter the other factors that censure this scheme").

Second, the district court's finding of responsiveness cannot be weighed in the abstract. Responsiveness, like many things, is a question of both kind and degree. While two cities may both be said to be responsive to minority needs, the two may vary greatly in approach and commitment. The totality-of-circumstances inquiry is not blind to those differences. Although we acknowledge that discerning those differences demands difficult qualitative judgments, see S. Rep. 417 at 29 n.115, reprinted in 1982 U.S.C.C.A.N. at 207 n.115 (noting responsiveness is less objective factor than others), we are reminded that "[i]n countless areas of the law weighty legal conclusions frequently rest on methodologies that would make scientists blush." LULAC, 999 F.2d at 860. We offer no bright line here. We are content to note that paving roads left unpaved by years of discrimination and appointing a biracial redistricting commission do not reflect the comprehensive

18

and systematic responsiveness to minority needs that is entitled to substantial weight in the totality-of-circumstances inquiry. Cf. City of Niagara Falls, 65 F.3d at 1023 (describing city's "numerous" efforts to address minority needs).

E.

In its pre-remand opinion, the district court accepted the County's proffered justification for the current plan, finding that "attempting to maintain districts with equal road mileage is nontenuous." The plaintiffs challenge this finding, claiming that there is no evidence that the creation of a majority-minority district is incompatible with this interest. The County defends the district court's finding and argues that its interest in maintaining districts with equal road mileage should be given substantial weight. See LULAC, 999 F.2d at 871.

We find no merit to the suggestion that the County must prove that the challenged electoral system is necessary to achieve its interest in equalizing road mileage among districts. Id. at 875-76. We do, however, agree that this factor deserves little weight. In Jones v. City of Lubbock, 727 F.2d 364, 383 (5th Cir. 1984), we described this factor as having "diminished importance," and we expressed doubt "that the tenuousness factor has any probative value for evaluating the 'fairness' of the electoral system's impact."

Our decision in LULAC does not undermine but rather supports that conclusion. In that case, we distinguished between a non-tenuous state interest and a substantial state interest. 999 F.2d

19

at 870 (noting that Texas did not assert non-tenuous but rather substantial interest). Although we noted that "[t]he weight, as well as tenuousness, of the state's interest is a legitimate factor in analyzing the totality of circumstances," id. at 871, we reaffirmed that "[p]roof of a merely non-tenuous state interest discounts one Zimmer factor, but cannot defeat liability." Id.

The district court here did not characterize the County's interest in equalizing road mileage in the districts as substantial. Nor likely could it. The County points to no decision holding that its interest in equal road mileage among election districts is substantial. The administrative convenience of such a system is evident, but the County's asserted interest pales in comparison to that upheld in LULAC. Id. at 872 (noting Texas' interest is a "key component" of what defines or "what constitutes a state court judge"). Indeed, there is no suggestion that equal road mileage is "integral" to the office of county supervisor, much less to the office of election commissioner or board of education. Id.

## F.

In Gingles, the Court noted that the Senate Report advised that "there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other." Gingles, 478 U.S. at 45. In this case, we are persuaded that, under the totality of the circumstances, the plaintiffs have demonstrated a § 2 violation. Neither the County's responsiveness to its black citizenry nor its interest in equalizing road mileage

20

among districts mitigates the striking lack of black electoral success in county elections and the "uncontradicted" existence of racially polarized voting. In short, this is not that "unusual case" in which the three Gingles preconditions are satisfied but the totality of circumstances fail to show a § 2 violation. See, e.g., City of Niagara Falls, 65 F.3d at 1020 (concluding that, under totality of circumstances, no § 2 violation existed where "many" of the Senate Report factors pointed against the plaintiffs). The district court's finding to the contrary is clearly erroneous.

### III.

As an alternative ground for affirming the judgment of the district court, the County argues that the proposed majority-minority district violates the Equal Protection Clause of the Fourteenth Amendment. The County relies on the Supreme Court's decision in Miller v. Johnson, 115 S.Ct. 2475, 2488 (1995), which held that strict scrutiny applies to redistricting plans where "race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." The County claims that racial considerations dominated the drawing of the proposed black-majority district in Calhoun County and that, therefore, the proposed district is unconstitutional after Miller.

The County's argument has more bite than might appear at first glance. Its implications travel far beyond Calhoun County and threaten the constitutionality of the Voting Rights Act itself. In

21

light of this, it is not surprising that we have been chary of reaching the issue of Miller's applicability to vote dilution claims brought pursuant to § 2 of the Voting Rights Act. See, e.g., Alonzo, 68 F.3d at 947 n.2 (reserving the question). We are loathe to revisit that Act's validity, and upon closer examination, we are not persuaded that Miller and its progeny prohibit redistricting plans drawn to remedy violations of § 2 of the Voting Rights Act. We begin with Miller.

A.

In Miller, the Supreme Court confronted the constitutionality of Georgia's Eleventh Congressional District, one of three majority-minority districts in the State. Drawn in response to the Justice Department's refusal to preclear earlier reapportionment plans pursuant to § 5 of the 1965 Voting Rights Act, the Eleventh District mimicked Sherman's March-to-the-Sea, traversing the 260 miles from Atlanta to Savannah. A three-judge district court panel found that race was the dominant purpose in creating the Eleventh District. On appeal to the Supreme Court, the appellants did not contest the district court's finding but rather claimed that the legislature's motivation by itself did not suffice to state a claim under Shaw v. Reno, 113 S.Ct. 2816 (1993). Rather, the appellants argued that the district court must find that the district's shape was so bizarre on its face as to be unexplainable on grounds other than race. The Supreme Court disagreed.

Noting that the Equal Protection Clause subjects facially-neutral statutes motivated by racial considerations to strict

22

scrutiny, the Court rejected the view that bizarre shape was a prerequisite to an equal protection claim:

> Shape is relevant not because bizarreness is a necessary element of the constitutional wrong or a threshold requirement of proof, but because it may be persuasive circumstantial evidence that race for its own sake, and not other districting principles, was the legislature's dominant and controlling rationale in drawing its district lines.

115 S.Ct. at 2486. The Court made clear that plaintiffs who challenge the constitutionality of reapportionment plans "are neither confined in their proof to evidence regarding the district's geometry and makeup nor required to make a threshold showing of bizarreness." Id. at 2488.

The Court encountered greater difficulty, however, in affirmatively defining the plaintiff's burden of proof. The Court acknowledged that legislatures will "almost always be aware of racial demographics; but it does not follow that race predominates in the redistricting process." Id. Distinguishing between permissible awareness and impermissible motivation "may be difficult" and will require courts "to exercise extraordinary caution in adjudicating claims that a state has drawn district lines on the basis of race." Id. Nevertheless, the Court attempted a definition:

> The plaintiff's burden is to show, either through circumstantial evidence of a district's shape and demographics or more direct evidence going to legislative purpose, that race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district. To make this showing, a plaintiff must prove that the legislature subordinated traditional race-neutral districting principles, including but not limited to compactness, contiguity, respect for political

23

subdivisions or communities defined by actual shared interests, to racial considerations.

Id. Justice O'Connor added in her concurring opinion that this standard was "a demanding one," requiring the plaintiff to show that the legislature "has relied on race in substantial disregard of customary and traditional districting practices." Id. at 2497 (O'Connor, J., concurring). In those cases where the plaintiff successfully proves that race was the "predominant, overriding" consideration motivating the drawing of district lines, the burden shifts to the defendant to demonstrate that its districting plan is narrowly tailored to achieve a compelling governmental interest. Id. at 2490.

Agreeing with the district court that race was the predominant factor motivating the drawing of the Eleventh Congressional District, the Court turned to the requirements of strict scrutiny. Georgia argued that compliance with the preclearance requirement of § 5 of the Voting Rights Act was a compelling governmental interest. The Court did not reach the validity of that position:

> Whether or not in some cases compliance with the Voting Rights Act, standing alone, can provide a compelling interest independent of any interest in remedying past discrimination, it cannot do so here. As we suggested in Shaw, compliance with federal antidiscrimination laws cannot justify race-based districting where the challenged district was not reasonably necessary under a constitutional reading and application of those laws.

Id. at 2490-91.

The Court concluded that the Eleventh District was not required by the Voting Rights Act "under a correct reading of the statute." Id. at 2491. That Georgia drew the Eleventh District in

24

order to obtain preclearance under § 5 of the Voting Rights Act did not mean that the plan was required by the Act. Id. To the contrary, the Eleventh District was not required under the Act "because there was no reasonable basis to believe that Georgia's earlier enacted plans violated § 5." Id. at 2492. Noting that the earlier plans had increased the number of majority-minority districts from the previous apportionment, the Court explained that such ameliorative plans did not violate § 5 "unless the new apportionment itself so discriminates on the basis of race or color as to violate the Constitution." Id.

The Court added that the Justice Department's interpretation of § 5 as authorizing it to preclear only those reapportionment plans that maximized majority-minority districts portended constitutional difficulties for § 5 and brought the Voting Rights Act "into tension with the Fourteenth Amendment." Id. at 2493. The Court eschewed reaching the constitutional question, however, noting only that there was no indication that Congress intended § 5 of the Voting Rights Act to reach as far as the Justice Department had pushed it. Id.

Miller left open several critical questions. The Court assumed but did not decide that compliance with the Voting Rights Act constituted a compelling governmental interest. Moreover, Miller did not address in what instances a State may draw majority-minority districts to remedy potential or adjudicated violations of § 2 of the Voting Rights Act.

25

Second, while Miller left these issues unresolved, its condemnation of race-based districting decisions was loud and clear.  The Court described the evils of race-based redistricting, declaring that "'[r]acial gerrymandering, even for remedial purposes, may balkanize us into competing racial factions; it threatens to carry us further from the goal of a political system in which race no longer matters--a goal that the Fourteenth and Fifteenth Amendments embody, and to which the Nation continues to aspire.'"  Id. at 2486 (quoting Shaw, 113 S.Ct. at 2832) (emphasis added).

The Court's recent decisions in Bush v. Vera, 1996 WL 315857 (1996), and Shaw v. Hunt, 1996 WL 315870 (1996) (Shaw II), built upon the framework established by Miller and resolved several of the questions Miller had left unanswered.  In Bush, the Court struck down three majority-minority Congressional districts in Texas as violative of the Equal Protection Clause.  The three districts were the product of the Texas legislature's effort to increase the number of majority-minority districts in the State. No opinion commanded a majority.  Justice O'Connor, writing for two other Justices, began her analysis by noting that strict scrutiny does not apply to all cases involving the intentional creation of majority-minority districts.  1996 WL 315857, at *5.  Rather, Justice O'Connor reaffirmed Miller's predominant factor test and

26

found that the three challenged districts all failed that test, thereby triggering strict scrutiny.[2]

To justify its race-based redistricting, Texas pointed to three interests: the interest in avoiding liability under § 2 of the Voting Rights Act, the interest in remedying past and present discrimination, and the interest in complying with § 5 of the Voting Rights Act. It is the Court's treatment of the first interest that concerns us the most in this case.

In her opinion for the plurality, Justice O'Connor assumed without deciding that compliance with § 2 of the Voting Rights Act constituted a compelling governmental interest. Id. at *15. Although strict scrutiny is a demanding standard, Justice O'Connor explained that the narrow tailoring prong of the test permitted the States "a limited degree of leeway" in drawing a remedial, majority-minority district. Id. To demonstrate that a majority-minority district is reasonably necessary to comply with § 2, the State must have a "strong basis in evidence" for finding that the three Gingles preconditions exist. Id.

---

[2] Justices Thomas and Scalia, who did not join Justice O'Connor's opinion for the plurality but provided a majority by concurring in the judgment, disagreed with the plurality on this point and concluded that the intentional creation of a majority-minority district was sufficient to trigger strict scrutiny. Id. at *27. On this point, at least six Justices sided with Justice O'Connor's view of the law. Compare id. at *5 (O'Connor, J., joined by Rehnquist, C.J., and Kennedy, J.); id. at *31 & n.7 (Stevens, J., joined by Ginsburg and Breyer, J.J., dissenting); id. at *56 (Souter, J., joined by Ginsburg and Breyer, J.J., dissenting) with id. at *25 (Kennedy, J., concurring) (reserving the question) and id. at *27 (Thomas, J., joined by Scalia, J., concurring in the judgment).

27

Although Justice O'Connor was willing to assume the existence of the last two Gingles preconditions in the instant case, she concluded that the challenged districts' bizarre shape and lack of compactness "defeat[ed] any claim that the districts are narrowly tailored to serve the State's interest in avoiding liability under § 2." Id. at *16. Although "[a] § 2 district that is reasonably compact and regular, taking into account traditional districting principles such as maintaining communities of interest and traditional boundaries, may pass strict scrutiny without having to defeat rival compact districts designed by plaintiffs' experts in endless 'beauty contests,'" id. at *15, a non-compact majority-minority district is not required by § 2 and, therefore, fails the narrowly tailored prong of strict scrutiny. Id. at *16. Justices Thomas and Scalia, concurring in the judgment, agreed without elaboration that the districts were not narrowly tailored. Id. at *29.

Of particular significance, both Justice O'Connor and Justice Kennedy filed concurring opinions that further addressed the relationship between the Equal Protection Clause and § 2 of the Voting Rights Act. Although Justice O'Connor's opinion for the plurality only assumed that compliance with the Voting Rights Act was a compelling governmental interest, Justice O'Connor expressly adopted that position in her separate concurring opinion. See id. at *21. On this point, at least four other Justices agreed with Justice O'Connor. See id. at *41 (Stevens, J., joined by Ginsburg and Breyer, J.J., dissenting); id. at *46, *56 (Souter, J., joined

28

by Ginsburg and Breyer, J.J., dissenting).  Moreover, Justice O'Connor opined that "if a State pursues that compelling interest by creating a district that 'substantially addresses' the potential liability, and does not deviate substantially from a hypothetical court-drawn § 2 district for predominantly racial reasons, its districting plan will be deemed narrowly tailored."  Id. at *23.

Justice Kennedy agreed that the three challenged districts were not narrowly tailored to serve the asserted interest in complying with § 2 of the Voting Rights Act, but his approach differed slightly from the plurality's.  Id. at *25.  Justice Kennedy noted that the first Gingles precondition focuses not on the compactness of the contested district but rather the compactness of the minority population.  Id.  As a consequence, Justice Kennedy was willing to assume that Texas had a strong basis in evidence for concluding that all three Gingles preconditions existed.  Indeed, only if all three Gingles preconditions were met would a court reach the question whether the challenged district was narrowly tailored to remedying the potential § 2 violation.

Nevertheless, the challenged districts' lack of compactness, which persuaded Justice O'Connor that the first Gingles factor was not met, persuaded Justice Kennedy that the districts did not substantially address the potential § 2 violation. Emphasizing the plurality's statement that the remedial district "must 'substantially address the § 2 violation'" to satisfy the narrow tailoring prong of strict scrutiny, Justice Kennedy attempted to give content to that phrase by noting that a State "may not engage

29

in districting based on race except as <u>reasonably necessary</u> to cure the anticipated § 2 violation, nor may it use race as a proxy to serve other interests." <u>Id.</u> at *26 (emphasis added). In Justice Kennedy's eyes, the inclusion of some minority communities that "could not possibly form part of a compact majority-minority district" belied the claim that Texas drew the district to remedy a potential § 2 violation. <u>Id.</u> Justice Kennedy cautioned, however, that the Court's focus on compactness did not mean that all majority-minority districts had to be compact to satisfy constitutional scrutiny. To the contrary, "[d]istricts not drawn for impermissible reasons or according to impermissible criteria may take any shape, even a bizarre one." <u>Id.</u> at *27.

<u>Shaw II</u>, which was decided the same day as <u>Bush</u>, invalidated North Carolina's Twelfth Congressional District, a "serpentine" district 160 miles in length and often no wider than the interstate that it followed in its "snake-like" trek through the heart of the State. 1996 WL 315870, at *3, *4. Applying <u>Miller</u>'s predominant purpose test, the Court found that race was the predominant factor in drawing the challenged district. <u>Id.</u> at *4. As in <u>Bush</u>, the Court assumed that compliance with the Voting Rights Act was a compelling governmental interest, <u>see</u> <u>id.</u> at *6 n.4, *9, but it concluded that District 12 was not narrowly tailored to that end. <u>Id.</u> at *10. The Court explained that the majority-minority district "must, at a minimum, remedy the anticipated violation [of § 2] or achieve compliance to be narrowly tailored." <u>Id.</u> at *9. Noting that the first <u>Gingles</u> precondition requires the existence

30

of a geographically compact minority group, Chief Justice Rehnquist declared that "[n]o one looking at District 12 could reasonably suggest that the district contains a 'geographically compact' population of any race." Id. at *10.

Taken together, these decisions establish a number of important propositions. First, race-based redistricting, even that done for remedial purposes, is subject to strict scrutiny. Second, compliance with § 2 of the Voting Rights Act constitutes a compelling governmental interest. Third, the State must have a strong basis in evidence for concluding that the three Gingles preconditions exist in order to claim that its redistricting plan is reasonably necessary to comply with § 2. Fourth, a tailored response to a found violation must use race at the expense of traditional political concerns no more than is reasonably necessary to remedy the wrong. With these propositions in mind, we turn to the County's arguments in this case.

B.

The County frames its Miller argument in two ways. First, it claims that Miller limits the scope of the first Gingles factor, which requires proof that a geographically compact majority-minority district can be created. According to the County, the plaintiffs' proposed redistricting plans violate Miller and, therefore, are not "a proper foundation for a holding that Plaintiffs-Appellants have satisfied the first Gingles precondition of a sufficiently numerous, geographically compact minority

population."  To fully understand the County's argument, we must return to our first decision in this case.

In the first appeal, the County claimed that the Supreme Court's then-recent decision in Shaw supported the district court's finding that the plaintiffs had not established the first Gingles factor.  According to the County, a districting scheme that violated Shaw's requirement of compactness per se failed to satisfy the first Gingles precondition.  We acknowledged Shaw's holding that a voting scheme "so extremely irregular on its face that it rationally can be viewed only as an effort to segregate the races for purposes of voting" stated a claim under the Equal Protection Clause.  However, we noted that the proposed district in this case was "not nearly as bizarre as the district under consideration in Shaw." 21 F.3d at 95.  We consequently refused to determine "whether a bizarrely-shaped district which would enable plaintiffs to state a claim under the Equal Protection Clause would necessarily flunk the Gingles compactness test."  Id. at 95-96.

The County's Miller contention builds upon this earlier argument.  According to the County, Miller clarifies Shaw by explaining that the gravamen of an Equal Protection claim is not the shape of the district but rather the legislature's motivation or purpose in drawing the district as it did.  The argument continues that the plaintiffs' predominant concern with race in drawing their proposed district places it squarely within Miller and therefore outside the first Gingles factor.  Stated another

32

way, a proposed district that violates <u>Miller</u> does not satisfy the first <u>Gingles</u> factor per se.

We agree with the County's reading of <u>Miller</u> but disagree that <u>Miller</u> is relevant to the first <u>Gingles</u> factor. In contrast to <u>Shaw</u>'s focus on compactness, <u>Miller</u> explained that compactness was not the gravamen of Equal Protection challenges to reapportionment plans. To the contrary, compactness was merely one among many factors whose presence bore on the ultimate question whether race was the predominant factor motivating the drawing of particular district lines.

In contrast to <u>Miller</u>'s focus on motivation, the first <u>Gingles</u> factor requires that the plaintiff demonstrate that the minority group is "sufficiently large and geographically compact to constitute a majority in a single-member district." <u>Gingles</u>, 478 U.S. at 50. Plaintiffs typically attempt to satisfy this requirement by drawing hypothetical majority-minority districts. When combined with the second <u>Gingles</u> factor requiring that minority voters demonstrate their political cohesiveness, the first <u>Gingles</u> factor ensures that the minority has the potential to elect a representative of its own choice in some single-member district. <u>See</u> <u>Growe</u>, 113 S.Ct. at 1084; <u>Gingles</u>, 478 U.S. at 50 & n.17. Absent a satisfactory showing on the first <u>Gingles</u> factor, minority voters cannot claim that it is the current districting system and not, for example, geographic dispersal that is the source of their disproportionately weak political strength. <u>Gingles</u>, 478 U.S. at 50 n.17.

33

Bush and Shaw II support our conclusion that Miller's emphasis on purpose does not apply to the first Gingles precondition. In neither case did the Court suggest that a district drawn for predominantly racial reasons would necessarily fail the Gingles test. To the contrary, the first Gingles factor is an inquiry into causation that necessarily classifies voters by their race.

In short, we do not understand Miller and its progeny to work a change in the first Gingles inquiry into whether a sufficiently large and compact district can be drawn in which the powerful minority would constitute a majority. See Harvell, 71 F.3d at 1391 (noting that Miller "did not purport to alter our inquiry into the vote-dilution claim"). To be sure, this test of causation insists upon a compact district, and a remedial response narrowly tailored to remedying a found violation must also be compact. As we will explain, however, that tailored response must use race at the expense of traditional political concerns no more than is reasonably necessary to remedy the found wrong.

C.

Alternatively, the County argues that we should affirm the judgment below because there is no constitutional remedy. According to the County, the plaintiffs' proposed redistricting plans violate Miller. The County argues that, consequently, it would be subject to lawsuits under Miller if it were to implement one of the plaintiffs' proposed redistricting plans. The argument is that the County did not violate § 2 because the plaintiffs' proposed remedy violates the Equal Protection Clause.

34

To the extent that the County challenges the remedy, it is not ripe for our review. Plaintiffs' majority-minority districts were identified in answer to the first Gingles inquiry into causation. See Clark, 21 F.3d at 95 (noting that plaintiffs' proposed districts were "simply presented to demonstrate that a majority-black district is feasible in Calhoun County"). Calhoun County's Board of Supervisors has primary jurisdiction over its electoral system. "It must be left to that body to develop, in the first instance, a plan which will remedy the dilution of the votes of the city's black citizens." Westwego III, 946 F.2d at 1124; see also Clark, 21 F.3d at 95 (noting that "the county will be given the first opportunity to develop a remedial plan"). That body is free, within limits,[3] to develop a different remedial plan from those proposed by the plaintiffs.

This is not to say that Bush does not insist that districting plans drawn to remedy potential violations of the Voting Rights Act escape scrutiny under the Equal Protection Clause. 1996 WL 315857, at *15-16. It is true that here, unlike Bush, there is an adjudicated violation of the Voting Rights Act, but that does not remove the constitutional constraints. See Dillard v. City of Greensboro, 74 F.3d 230, 233-34 (11th Cir. 1996) (applying Miller to redistricting plan imposed by district court to remedy § 2 violation). It is also true that Miller, Bush, and Shaw II make

---

If the board of supervisors "fails to develop such a plan in a timely manner, or fails to develop a plan which fully remedies the current vote dilution, the responsibility for devising a remedial plan will devolve onto the federal district court." Westwego III, 946 F.2d at 1124.

35

clear that a majority-minority district is not per se unconstitutional. Calhoun County's argument to the contrary glosses over a number of required analytical steps.

Bush established a two-part inquiry for determining whether a majority-minority district passes constitutional muster. Such a district is constitutional if the State has a "strong basis in evidence" for concluding that the three Gingles preconditions are present and if the district drawn in order to satisfy § 2 does not "subordinate traditional districting principles to race substantially more than is 'reasonably necessary' to avoid § 2 liability." 1996 WL 315857, at *16. Although a State need not await judicial findings to that effect, see id. at *23 (O'Connor, J., concurring), we have already found that the three Gingles preconditions exist here.

To be narrowly tailored, the remedial district must use race at the expense of traditional political concerns no more than is reasonably necessary to remedy the found wrong. Stated another way, the remedial district must "substantially address" the violation and "not deviate substantially from a hypothetical court-drawn § 2 district for predominantly racial reasons." Id. (O'Connor, J., concurring); id. at *26 (Kennedy, J., concurring); see also Shaw II, 1996 WL 315870, at *9 (holding that majority-minority district must, "at a minimum," remedy the violation to be narrowly tailored). As this language suggests, the proposed majority-minority district used to satisfy the first Gingles factor exemplifies the narrowly tailored district. Indeed, it is

36

deviations from this district that raise problems. See Bush, 1996 WL 315857, at *16; Shaw II, 1996 WL 315870, at *10. And, of course, a district court supervising the development of a remedy may reject a proposed remedial district that "substantially deviates" from the hypothetical district.

There has been no finding that the plaintiffs' plans subordinate traditional race-neutral districting plans to racial considerations. The plaintiffs presented several redistricting plans to the district court, one of which allegedly made "minimal changes to existing districts and precinct lines." Compare Miller, 115 S.Ct. at 2497 (O'Connor, J., concurring) (noting that predominant factor test is "a demanding one") with Quilter v. Voinovich, 912 F. Supp. 1006, 1019 (N.D. Ohio) (holding that predominant factor test is satisfied where "a state substantially complies with traditional districting principles" but "gives them less weight in the apportionment process than racial considerations"), appeal dismissed, 116 S.Ct. 42 (1995). Whether those changes are truly "minimal" and, if not, whether the districts use race no more than is reasonably necessary to remedy the found violation are questions best left to the district court on remand.

Redistricting to remedy found violations of § 2 of the Voting Rights Act by definition employs race. Miller, Shaw II, and Bush, however, do not foreclose the ability of States to act "to remedy the reality of racial inequality in our political system." Bush, 1996 WL 315857, at *24 (O'Connor, J., concurring). The limit is

37

that the remedy must use race at the expense of traditional political concerns no more than is reasonably necessary to remedy the found wrong.

                                    IV.

Calhoun County's districting system dilutes minority voting strength in violation of § 2 of the Voting Rights Act. Accordingly, we REVERSE the judgment of the district court, RENDER judgment for the plaintiffs on liability, and REMAND the case to the district court to supervise the development of a remedial plan and to determine what amount, if any, the plaintiffs are entitled to recover in court costs and attorneys' fees.